**Edward Lyle HALL, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F-79-723.**

Court of Criminal Appeals of Oklahoma.

Sept. 1, 1982.

Mark Barrett, Asst. Appellate Public Defender, Norman, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan Talbot, Asst. Atty. Gen., Chief, Appellate Criminal Div., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

Edward Lyle Hall was convicted of Murder in the First Degree. The jury recommended the death penalty after finding Hall guilty of killing a prison guard during his escape from the State Penitentiary at McAlester.

Three assertions of error will be addressed on appeal: (1) Is Hall's felony-murder conviction violative of the Fifth Amendment double jeopardy clause? (2) Was Hall denied a fair trial as a result of the State's failure to disclose exculpatory evidence and perjured testimony? (3) Did

the trial court err in excluding evidence of Sealy's prison record?·

## I

█ We will first address Hall's argument that his felony-murder conviction violates double jeopardy principles. Hall was initially charged with two separate offenses: Escape from Prison and Felony-Murder. On September 6, 1979, the State filed a motion to consolidate the two charges, which the trial court granted since both offenses were based upon the same acts or transactions. Joining the two informations for trial was the proper procedure under 22 O.S. 1981, § 438. See *Dodson v. State,* 562 P.2d 916 (Okl. Cr. App. 1977).

Prior to trial, Hall entered a plea of guilty on the escape count. He then proceeded to trial on the felony-murder count and was found guilty. Hall neither claimed a double jeopardy violation prior to trial nor when he motioned for new trial; rather he raised it for the first time on appeal.

█ In view of *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); and *Brown v. Ohio,* 431 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), we find that the double jeopardy clause was violated. In this case the escape from prison was used as the predicate felony in the felony-murder prosecution. Hall's trial on the greater offense of felony-murder subsequent to his plea of guilty to escape from prison contravenes double jeopardy protections. To support a conviction for felony-murder the State was required to prove Hall guilty of escape from prison; a crime of which he had already been found guilty. See *State v. Cooper,* 13 N.J. Laws 361 (1833). The Fifth Amendment forbids successive prosecutions and cumulative punishment for a greater and lesser included offense regardless of the sequence in which they are tried. *Brown v. Ohio,* supra 432 U.S. at 169, 97 S.Ct. at 2227.

█ The double jeopardy prohibition protects persons from being subjected to the harassment of multiple trials and multiple convictions for the same offense. In *Green v. United States,* 355 U.S. 184, 188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957), the Supreme Court stated:

> [T]he underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

In *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) (plurality opinion), the Supreme Court enunciated exceptions to the rule established in the *Brown* decision. In *Jeffers* the Supreme Court held that Jeffers' separate trials violated the double jeopardy clause. Jeffers was initially tried under 21 U.S.C. § 846 for conspiring to distribute heroin and cocaine. In the second trial Jeffers was tried and convicted under 21 U.S.C. § 848 for conducting a continuing criminal enterprise. The Court held that the § 846 conspiracy offense was a lesser included offense of the § 848 continuing criminal enterprise. Because § 848 required proof of every fact necessary to show a violation under § 846, the separate trials violated the well established double jeopardy rule stated in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

The *Jeffers* Court reiterated that "the sequences of the two trials for the greater and lesser offense is immaterial, and trial· on a greater offense after conviction on a lesser ordinarily is just as objectionable under the double jeopardy clause as the reverse order of the proceeding." 432 U.S. at 151, 97 S.Ct. at 2216.

After finding that the defendant had been placed in double jeopardy the Supreme Court asserted that Jeffers had waived his double jeopardy protection prior to trial, since Jeffers was solely responsible for the successive trials. In *Jeffers* the government had filed a motion to try the § 846

and the § 848 charges in one proceeding. The consolidation would have been proper under Fed. Rule Crim. Proc. 13. The defendant filed an objection to the consolidation. He successfully argued that the joinder would be improper since neither the parties nor the charges were the same.

The Court stated, that ". . . under these circumstances, we hold that this action deprived him of any right that he might have had against consecutive trials." 432 U.S. at 154, 97 S.Ct. at 2218. The Court in dicta asserted that "if the two charges had been tried in one proceeding, it appears the petitioner would have been entitled to a lesser included-offense-instruction . . . If such an instruction had been denied on the ground that § 846 was not a lesser included offense of § 848, petitioner could have preserved his point by proper objection." *Id.*

The issue at bar is whether Hall affirmatively waived his double jeopardy claim. Hall voluntarily pleaded guilty to the escape charge, after the two offenses were properly consolidated, and then proceeded to trial on the felony-murder without raising the jeopardy issue.

██ In this case, Hall's plea of guilty to the escape charge effectively severed his once consolidated trial. A defendant may generally require the lesser and greater offenses be resolved in one proceeding, however, double jeopardy does not preclude him from electing to have them tried separately. Therefore, we find that Hall affirmatively waived his double jeopardy claim.

██ This view is strengthened by the fact that Hall did not timely object to the subsequent trial on the grounds of double jeopardy. The long established rule in Oklahoma is that protection from double jeopardy is a personal right which may be waived by the defendant's failure to assert the defense or make a timely objection. *Johnson v. State,* 611 P.2d 1137 (Ok. Cr. App. 1980); *Smith v. State,* 573 P.2d 1215 (Okl. Cr. App. 1978), *cert. denied,* 436 U.S.

908, 98 S.Ct. 2242, 56 L.Ed.2d 407; *Voran v. State,* 536 P.2d 1322 (Okl. Cr. App. 1975); *Stockton v. State,* 508 P.2d 663 (Okl. Cr. App. 1973); *Ex Parte Kirk,* 96 Okl.Cr.App. 272, 252 P.2d 1032 (1953); *Daniels v. State,* 55 Okl.Cr.App. 298, 29 P.2d 997 (1934); *Ex Parte Zeligson,* 47 Okl.Cr.App. 45, 287 P. 731 (1930); *Jeter v. District Court of Tulsa County,* 87 Okl. 3, 206 P. 831 (1922). See also *U.S. v. Perez,* 565 F.2d 1227 (2nd. Cir. 1977), (Construing Fed. Rules Crim. Proc. rule 12(b)(2), (f)).

## II

The dispositive issue in this appeal is whether the State's failure to disclose exculpatory evidence denied the appellant a fair trial. Subsequent to the appellant's trial, it was discovered that the State had failed to disclose certain exculpatory evidence. On March 5, 1981, after his appeal had been perfected in this Court, we ordered the trial court to conduct a hearing on this issue. At the evidentiary hearing it was revealed that the State during its investigation had obtained evidence that a prime suspect in the case, Shelton Sealy, was acquainted with the victim, Albert Cox.[1]

Joe Kirkpatrick, a prison employee, testified that he had informed the district attorney prior to trial that there was an intense animosity between Sealy and Cox. He testified that on one occasion Cox had gassed Sealy. As a result of this incident, Sealy allegedly threatened to kill Cox even if he had to go to his house to do it. However, Sealy testified at trial that he was not acquainted with Cox and never had any trouble with him. The trial court ruled that the prosecution was aware, or should have been aware that Sealy's testimony was perjured. The State does not refute its knowledge of this evidence.

██ It is well established that the State's knowing use of perjured testimony violates

---

1. The appellant's motion to produce exculpatory evidence requested all information which tended to exculpate Hall or any evidence which could be useful to impeach the credibility of any government witness. Secondly, the motion to produce exculpatory evidence specifically requested the criminal records of Shelton Sealy.

one's due process right to a fair trial. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Due process demands that the State avoid soliciting perjured testimony, and imposes an affirmative duty upon the State to disclose false testimony which goes to the merits of the case or to the credibility of the witness. See *Napue v. Illinois,* supra, 360 U.S. at 269, 79 S.Ct. at 1177.

■ In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and later in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court delineated the prosecutor's obligation to provide the defendant with exculpatory evidence. In *Brady* the Court held that suppression by the State of evidence specifically requested by the defendant "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." *Brady v. Maryland,* supra, 373 U.S. at 87, 83 S.Ct. at 1196–97.

In *Agurs* the Supreme Court announced that the *Brady* rule applies in three different situations in which the defense discovers information after trial which had been known to the prosecution. The first situation involves the use of perjured testimony where the prosecution knew or should have known of the perjury. A resulting conviction "is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* supra, 427 U.S. at 103, 96 S.Ct. at 2397. The Court further asserted that in this situation a strict standard of materiality must be applied. The Court reasoned that a strict standard is necessary not merely because of the prosecutorial misconduct, but more importantly because of the "corruption of the truth-seeking function of the trial process." *Supra.*

The second situation, as typified in *Brady,* is where there is a pretrial request for specific evidence.. The test of materiality is whether the requested evidence might affect the outcome of the trial. The suppressed evidence must be of sufficient probative value to create a reasonable doubt of the defendant's guilt. This language is equivalent to the harmless error standard utilized in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The entire trial is not lacking in due process unless there is a "reasonable probability" that the error materially affected the verdict.

The final situation, illustrated by the *Agurs* case, involves the situation where there has been no specific request for exculpatory evidence, in which event the prosecution has a duty to provide the defense with exculpatory evidence only if it "creates a reasonable doubt that did not otherwise exist...." 427 U.S. at 112, 96 S.Ct. at 2402. This test of materiality is more rigid than the harmless error standard utilized where there is a specific request for exculpatory evidence. Therefore, where there is a no request or merely a general request for exculpatory evidence the likelihood that the suppressed evidence would have resulted in an acquittal must amount to more than a reasonable probability.

The question here involves the first situation. The prosecutor had an affirmative obligation to correct the record when Sealy allegedly falsely testified that he was not acquainted with Cox and had never been in any trouble with Cox. It is apparent from the evidentiary hearing held on March 5, 1981, that the prosecutor failed to discharge his obligation.

Our inquiry, at this point, is whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," and therefore necessitate a new trial. *United States v. Agurs,* supra, 427 U.S. at 103, 96 S.Ct. at 2397. A review of evidence is necessary to determine whether the State's nondisclosure was sufficiently material to mandate a new trial.

On March 5, 1977, Albert Cox, a guard at McAlester penitentiary, was killed and subsequently buried under bags of chicken feed located at the prison's chicken ranch. Hall was tried for the killing of Mr. Cox.

At trial, the State called three persons to the witness stand. First, the prison warden, Richard Crisp, testified that he was present when Cox' body was found. He stated that on the day of the killing, Hall escaped from the prison in a prison truck. It was further revealed that the prime suspects throughout the investigation were Shelton Sealy and the appellant, Hall, both of whom were assigned to duties in the chicken house in which the killing occurred. Crisp testified that Sealy had not given the prison any trouble, at least during the time Sealy was a trustee.

Next Dr. Bellamy testified that Cox' death resulted from a skull fracture caused by a blunt instrument and multiple stab wounds to his right side. He also reported that Cox was probably alive at the time he was placed on the bags of chicken feed.

The State's most persuasive evidence tending to establish Hall's guilt was elicited from Frank Ritter. Ritter testified that on March 5, 1977, he was in Ravia, Oklahoma fishing with his two sons. He related to the jury that the appellant approached them and had a casual conversation about fishing. However, when Mr. Ritter started to walk to the river the appellant grabbed Ritter's son and put a homemade knife to his neck. Ritter testified that at this point the appellant stated, "I'm a desperate man. I killed someone getting out of McAlester."

Apparently, the appellant released Mr. Ritter and his son unharmed and drove off in Ritter's car. It was established by stipulation that the appellant was arrested in Colorado about a year later. The State rested.

Six witnesses were called on behalf of the defense. For the purposes of this discussion we will only examine the testimonies of Shelton Sealy and the appellant. Hall testified in his own defense. He stated that he and Sealy were the only two persons working in the chicken house on the morning of the killing. He further explained to the jury that he left the chicken house to pick up some connectors and when he returned Cox was lying on the floor. Hall testified that Cox appeared to be dead. According to his testimony he knew he could not report the killing because there had recently been beatings and gassings inside the prison and that he feared for his life. Hall stated that he buried Cox under the bags of chicken feed and cleaned up the blood and chicken grime on the floor. After cleaning the chicken house, he drove away in the prison truck until it ran out of gas.

Hall admitted the confrontation with Mr. Ritter and his son near the Washita River. Hall testified that Ritter's version of the incident was fairly accurate. However, in Hall's version he stated to Ritter that, "I'm a desperate man. There's been a man killed at McAlester."

The defense could not locate Sealy and consequently could not subpoena him to testify at this trial. However, earlier Sealy had testified as a material witness for the State in the first prosecution of this cause which was declared a mistrial because the jury was unable to reach a unanimous verdict. In the present case, the defense introduced a transcript of Sealy's testimony given at the appellant's first trial.

Shelton Sealy's testimony predictably contradicted Hall's recollection of the killing. Sealy testified that he was in the chicken house at the time of the killing. He stated that when Cox entered the building Hall struck him in the back of the head with a nail bar. According to Sealy, Hall then proceeded to strike Cox several times over his heart with the bar and subsequently took everything of value out of his pockets. Sealy further testified that Hall lifted Cox up on the feed sacks, pulled out a knife and stabbed him and cut his throat.

During cross-examination it was brought out that Sealy had denied knowing anything about Cox' death when he was initially interviewed by law enforcement personnel. Additionally, at the preliminary hearing, Sealy denied having any knowledge of Cox' death.

We find that Sealy's testimony was critical to the jury's decision in this case. The perjured testimony went directly to the credibility of a key witness in the case, who was allegedly an eyewitness to the killing. The defense strategy throughout the trial was to convince the jury that Shelton Sealy was responsible for Cox' death. Therefore, a reasonable likelihood exists that a different verdict or punishment might have been reached had the jury been made aware of Sealy's perjury and personal motive for killing Cox.

■ On this point I disagree with the Special Concurrence filed by my brother, Presiding Judge Brett. I cannot find that the language in *Agurs* can be interpreted so as to make a distinction between the situation where the State knowingly elicits perjured testimony in its case and the situation, as here, where the State lays behind a log and allows a material witness to commit perjury during the defendant's case. In both situations, I believe that due process imposes an affirmative duty upon the State to disclose the false testimony. Where the perjured testimony is crucial to the jury's decision, irrespective of whether it is introduced during the State's case or the defendant's case, I must conclude the resulting conviction is "fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected" the verdict. *United States v. Agurs,* supra, 427 U.S. at 103, 96 S.Ct. at 2397.

### III

■ We also find it necessary to determine whether the appellant should have been allowed to introduce prison records containing information about Sealy's alleged incidents of misconduct during his prison term. The appellant argued at trial that the prison records tended to impeach Sealy's testimony. Secondly, the records refuted the testimony of Warden Richard Crisp that Sealy did not have a disciplinary record.

The prison records established that in January, 1979, a ten-inch homemade knife

was found in Sealy's prison cell. The records also showed that Sealy received an additional one-year sentence for assaulting a fellow inmate with a knife. And finally, the records revealed that Sealy was placed in administrative segregation because of his suspected involvement in the Cox murder.

The prison records were relevant to impeach the credibility of Sealy and to rebut Warden Crisp's testimony. Additionally, the records were admissible under the business records exception to the hearsay rule. Title 12 of the Oklahoma Statutes, section 2803(8) provides in part:

> ... records, reports, statements or data compilations in any form of public office or agency setting forth its regularly conducted and regularly recorded activities on matters observed pursuant to duty imposed by law and as to which there was a duty to report on factual finding resulting from an investigation made pursuant to authority granted by law. 12 O.S. 1981, § 2803(8).

Upon proper foundation, the prison records, were properly admissible under this section. The records intended to be introduced did not fall within any of the five exceptions enumerated in Section 2803(8). Therefore, we find that the trial court erred in excluding evidence of Sealy's prison records. *See also* 12 O.S. 1981, § 2803(6).

REVERSED and REMANDED for a new trial.

BRETT, P. J., specially concurs.

BUSSEY, J., dissents.

BRETT, Presiding Judge, specially concurs:

Although I concur that this case should be reversed, I do not concur in the reasoning the majority opinion utilized to reach their conclusion. The opinion holds, first, that exculpatory evidence was improperly withheld from the defense prior to trial. With this conclusion I agree. Secondly, the opinion holds that this withholding of exculpatory evidence allowed the conviction to be obtained through the use of perjured testi-

**900**

mony and thus created the first situation discussed in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) requiring reversal. I, however, believe that the first situation discussed in *Agurs* is inapplicable to the instant case. It needs to be made abundantly clear that Sealy's testimony which is alleged to have been perjured was introduced into evidence by the defendant and was not a part of the State's case. In *Agurs* the Supreme Court of the United States said:

> In the first situation, typified by *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.

This principal of reversing a case for the reason that the prosecution obtained the conviction through the use of perjured testimony was not applied in *Agurs*. It has, however, been applied several times by the Supreme Court. For instance in *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), the prosecutor exhibited to the jury a pair of shorts claiming them to be the defendant's blood-stained shorts when in fact the prosecutor knew them to have only been stained by paint. As this was a major piece of the State's evidence linking the defendant to the crime, the conviction was considered tainted and was reversed. In *Alcorta v. Texas,* 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), the prosecutor elicited testimony which he knew gave the jury a false impression. As this deception could easily have affected the verdict, the Supreme Court held that reversal was in order.

In *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942), and in *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), the Supreme Court again reversed convictions because the prosecution knowingly used perjured testimony to obtain convictions. In *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the District Attorney asked a principal State witness if he had been promised anything in return for his testimony, to which the witness responded that he had not. The prosecutor knew that this was false. The Supreme Court held that this elicitation on the part of the prosecutor of perjured testimony, although it only went to the credibility of the witness, warranted reversal. All of the foregoing cases involved the prosecutor's use of perjured or misleading testimony.

In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) during cross-examination of the State's witness, the defense counsel asked the witness if he had been promised anything for his testimony to which the witness responded that he had not. On redirect examination the prosecutor failed to elicit the truth that the witness had in fact been promised something if he testified for the State in the trial. The Supreme Court held that the prosecutor had committed reversible error by failing to correct the perjured testimony elicited by defense counsel during cross-examination of the State's witness. This case then involved the prosecutor's failure to come forward and correct that which he knew to be false testimony given by a State's witness. The conviction again was held to have been obtained through the use of perjured testimony and was reversed.

The instant case, however, presents a distinguishable situation from any of the above cases. In the case at bar the State's witnesses are not alleged to have perjured their testimony. It is the defense witness, Shelton Sealy, who is alleged to have committed perjury. I therefore believe that it is unfair to say that reversible error occurred when the prosecution used perjured testimony to obtain this conviction.

The prosecutor in the instant case, however, did not exhibit conduct expected of officers of our courts. First, when asked why he endorsed Mr. Kirkpatrick as a witness for preliminary hearing but had decided not to call him to testify, the prosecutor allegedly responded that Mr. Kirkpatrick would only testify as to collateral matters and was thus not needed. This misled defense counsel into believing that Mr.

Kirkpatrick knew of no substantive information concerning the case. Secondly, when defense counsel introduced into evidence Shelton Sealy's testimony as a State's witness at the previous trial, it must have given the jury the impression that Sealy did not know or have any prior significant encounters with the victim. In face of this false impression, the prosecutor chose to sit idly by although he had been provided information totally to the contrary. At that point the prosecutor should have brought to the court's attention that based on knowledge provided him that false evidence was going to the jury concerning Sealy's former encounters with the victim.

Additionally, however, I believe that although defense attorneys and prosecutors are entitled to rely upon each other to some extent, that this reliance must not be a substitute for trial preparation. At preliminary hearing it was revealed that Kirkpatrick was in charge of overseeing Sealy and the appellant on the day of the murder. Based on this information, it seems only logical that the defense counselors would have taken the time to interview Mr. Kirkpatrick to learn what light he could shed on the crime for which the client stood charged.

As the defense counselors failed to take the time to do so but rather chose to rely on the prosecutor, the defense went to trial allegedly unaware of Mr. Kirkpatrick's exculpatory information. Thus through a combination of errors, the jury received only the partial truth concerning the events surrounding this murder.

In summary, however, I agree that this case should be reversed as the prosecution did not reveal to the defense counsel exculpatory evidence which, although not specifically requested to be revealed in the motion for exculpatory evidence, was of such obvious and substantial value to the defense that elementary fairness required it to be disclosed. I believe that had the omitted evidence been presented to the jurors, a reasonable doubt might have been created in the minds of the jury as to whether Shelton Sealy or the appellant perpetrated this deplorable offense. Accordingly, I believe that fundamental fairness requires that this case be reversed and the appellant be given a new trial in which the jury will be presented with the whole truth rather than only with half of the facts and will thus be able to reach a verdict in accordance with the standards our society demands of our judicial system. *United States v. Agurs,* supra.